1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3

4

5

6

7

8

9

10

| | |
|---|---|
| IVY D. REECE,               ) | |
|                    ) | |
|         Plaintiff,     ) | Case No.: 2:10-cv-00114-GMN-RJJ |
|    vs.               ) | |
|                    ) | **ORDER** |
| REPUBLIC SERVICES, INC., REPUBLIC) | |
| SILVER STATE DISPOSAL, INC., d/b/a ) | |
| Cheyenne Transfer Station,     ) | |
|                    ) | |
|        Defendants.   ) | |
| _____) | |

11

12

13

      Pending before this Court is Defendant Republic Silver State Disposal, Inc.'s ("Defendant") Motion for Summary Judgment (ECF No. 22) and Motion to Strike (ECF No. 27). These motions are fully briefed and ripe for ruling.

14

15

16

17

      For the reasons that follow, Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's claim for Retaliation but is GRANTED as to Plaintiff's claims for Negligent Hiring, Training, and Supervision. Defendant's Motion to Strike is DENIED, except to the extent that it is consistent with the evidentiary rulings made in this Order.

18

### I.    FACTUAL AND PROCEDURAL HISTORY[1]

19

#### A.   Background

20

21

22

23

24

      Plaintiff Ivy Reece claims that Defendant Republic Silver State Disposal, Inc. unlawfully retaliated against him in violation of 42 U.S.C. § 1981 when Defendant fired him less than a month after he had filed a Charge of Discrimination with the Nevada Equal Rights Commission (NERC) against Defendant and one of its managers--Santino Paniccia. (Am. Compl. 3 ¶¶ 15–23, ECF No. 6.)

25

---

[1] As is appropriate at this stage in the proceedings, the facts portrayed here are presented in the light most favorable to Plaintiff and all justifiable inferences are drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*1. Paniccia's racist remark*

Plaintiff Ivy Reece was employed by Defendant Republic Silver State Disposal, Inc. from 2000 until 2008 as both a driver and a pitcher on a waste management truck.  At some point in 2004 or 2005, Santino "Sonny" Paniccia was hired also by Defendant. (Reece Dep. 57:1–2, ECF No. 25-2.)  When he was first hired, Paniccia did not supervise Plaintiff. (Reece Dep. 64:19–21, ECF No. 25-2). However, during his first week or so working for Defendant, Paniccia allegedly told a customer that all of Defendant's employees were "some dumb niggers." (Reece Dep. 65:1–2, ECF No. 25-2.)  Plaintiff did not hear Paniccia make this statement, but the customer told Charles Leech--one of the foremen employed by Defendant--about Paniccia's comment and Leech relayed the comment to Defendant's employees. (Reece Dep. 65:3–6, ECF No. 25-2.)

A few days later, Paul LaBruzzo--Defendant's general manager at the time--called a meeting at which Paniccia admitted to saying the "N-word" and apologized for having done so. (Reece Dep. 65:7-20, ECF No. 25-2.)  Paniccia then walked around and tried to shake everyone's hand, however Plaintiff, who identifies himself as Black[2], refused to shake his hand and told Paniccia that he was a racist. (Reece Dep. 65:21–25, ECF No. 25-2.)  Two or three years later, in approximately 2007, Paniccia became Plaintiff's foreman. (Reece Dep. 32:21–25, ECF No. 25-2.)

*2. Use of bathroom during extra route*

On one day in April of 2007, Plaintiff completed his assigned route and upon returning to Defendant's premises was then given an extra route by his new foreman, Paniccia. (Reece Dep. 33:24–34:1, ECF No. 25-2.)  While completing the extra route, Plaintiff had to use the restroom, so he and his co-driver were forced to leave the route to find a restroom. (Reece Dep. 34:8–14, ECF No. 25-2.)  While they were using the restroom, two of Defendant's supervisors drove down the street Plaintiff and his co-driver were

---

[2] Plaintiff identifies himself as "Black" in his Response (ECF No. 25, page 2) and Defendants identify Plaintiff as "African American." (ECF No. 22, page 3).

supposed to be servicing, and did not see them there. (Ex. 11, ECF No. 25-3.)  The

supervisors relayed this information to Paniccia, who then interviewed Plaintiff and his co-

driver separately upon their return to Defendant's premises. (*Id.*)  Paniccia asked both

Plaintiff and his co-driver to return on Monday with Union representation. (*Id.*)  Plaintiff

believes that he was then suspended from work for two weeks as a result of this incident.

(Reece Dep. 32:17–18, ECF No. 25-2.)

### 3. *Christmas gratuities incident*

Later, in December of 2007, about a week before Christmas, Paniccia reassigned

Plaintiff from his usual route and assigned this route to employees who were not Black.

(Reece Dep. 43:20–23, ECF No. 25-2.)  This upset Plaintiff and his co-driver because they

were expecting to receive their annual gratuities and Christmas gifts from patrons along their

usual route. (Reece Dep. 44:1–2, ECF No. 25-2.)  Plaintiff's co-driver confronted Paniccia

about this, and Paniccia agreed that he and the Plaintiff could still go on their usual route and

collect their gratuities and gifts. (Reece Dep. 44:3–7, ECF No. 25-2.)  Accordingly, Plaintiff

and his co-driver did so, but later Paniccia allegedly denied giving them permission and

instead attempted to discipline Plaintiff and his co-driver for collecting their earned gifts and

gratuities. (Reece Dep. 44:8–11, ECF No. 25-2.)

Sue Hunsberger--Defendant's Division Human Resources Manager at the Cheyenne

Transfer Station, (Hunsberger Decl. ¶ 2, ECF No. 23-1)--called Plaintiff and his co-driver

into her office on December 21, 2007 to discuss what had occurred, and Ms. Hunsberger

apparently agreed that Paniccia had lied, but told Plaintiff to "[l]eave it under the rug."

(Reece Dep. 44:13–17, ECF No. 25-2; Ex. 12, ECF No. 25-3.)  Plaintiff asked Kevin

Hardison--who is now president of the Teamsters--if the union would help. (Reece Dep.

44:18–21, ECF No. 25-2.)  Hardison indicated that the union would not do anything and

suggested that Plaintiff file a complaint with the Nevada Equal Rights Commission. (Reece

Dep. 44:21–24, ECF No. 25-2.)  Plaintiff filed his a complaint with the Nevada Equal Rights Commission against Paniccia at that time. (Reece Dep. 44:23–24, ECF No. 25-2.)

### 4.   *Disparate treatment NERC charge*

Plaintiff also allegedly suffered discrimination by Paniccia after Paniccia became Operations Manager for Defendant.  Plaintiff claims Wade Woods--a Caucasian employee—was allowed to leave early whenever he wanted, (Ex. 14, ECF No. 25-4); however, Plaintiff was not allowed to leave early when he requested to do so in September of 2008, even though Plaintiff's foreman appears to have supported Plaintiff's request. (Reece Dep. 46:18–22, ECF No. 25-2.)  According to Plaintiff, even Wade Woods commented that such disparate treatment was not fair. (Reece Dep. 46:23–47:3, ECF No. 25-2.)

As a result, Plaintiff filed a Charge of Discrimination with the Nevada Equal Rights Commission on October 17, 2008 that specifically named Paniccia as the person who had discriminated against him. (Ex. 14, ECF No. 25-4.)  The Nevada Equal Rights Commission issued a "no cause" finding on September 2, 2009. (Reece Dep. 47:24–25, ECF No. 25-2; Ex. 6, ECF No. 23-1.)  Plaintiff believes that this was because Paniccia received word of the discrimination charge and then "scared the mess out of Wade Woods" so that "Woods changed his whole story." (Reece Dep. 47:4–25, ECF No. 25-2.)  Plaintiff does not explain the basis for this belief, other than the fact that Woods somehow became aware of the charge filed and approached Plaintiff asking "why did you say something." (Reece Dep. 47:15–16, ECF No. 25-2.)

### B.   The October 29, 2008 Fight

Plaintiff was terminated by Defendant on November 12, 2008, (Ex. 2, ECF No. 25-2), less than a month after filing his Charge of Discrimination with the Nevada Equal Rights Commission.  Defendant indicated in the Notice of Termination that Plaintiff was being terminated "for violation of the following rules of conduct for a physical altercation that

happened at work on Wednesday, October 29, 2008." (Ex. 2, ECF No. 25-2.)

The rules Plaintiff was alleged to have violated were:

4) Causing a serious disturbance while on the Company's time, property, or equipment which interferes with employees [sic] work, the work of others, or the Company's operations.

8) Subjecting a customer or another employee, supervisor or manager to discrimination, abuse, confrontation, harassment in general or particularly on account of the person's race, color, religion, sex, national origin, handicap, or age, or any other reason.

(Ex. 2, ECF No. 25-2.)

The events leading up to the physical altercation began on the morning of October 29, 2008.  On that morning, Plaintiff carpooled to work with his co-workers Charles Watson and Undrea Marshall. (Reece Dep. 74:9–76:3, ECF No. 25-2.)  Once he arrived at work, Plaintiff climbed aboard a waste management truck with his co-worker, Joe Bell, and went out on his route. (Reece Dep. 76:9–16, ECF No. 25-2.)  After Plaintiff left on his route, Charles Watson and Omar Driver became embroiled in a shouting match. (Exs. 3 & 4, ECF No. 25-2.)  According to Christopher Garcia, that argument ended with Watson spitting in Omar Driver's face and Garcia breaking it up. (Ex. 3, ECF No. 25-2.)  According to Lance Singleton, Omar Driver hit Watson and knocked him down on his knees, so Singleton went over and pushed Watson around the waste management truck and told him to go to his own truck. (Ex. 4, ECF No. 25-2.)  Plaintiff was apparently not a participant, nor a witness to this incident.

However, that afternoon at 2:30 p.m., another incident occurred.  Plaintiff clocked out after completing his route. (Reece Dep. 79:23–24, ECF No. 25-2.)  Watson also clocked out at approximately the same time and then went and took a shower, while Marshall and Plaintiff played dominos and waited for Watson. (Reece Dep. 79:24–80:5, ECF No. 25-2.)  After Watson finished showering, he, Plaintiff and Marshall started walking to Watson's car.

(Reece Dep. 80:7–9, ECF No. 25-2.)  When the three of them arrived at Lot C, Plaintiff heard someone say, "What's up, bitch?"  Plaintiff turned to see Driver "trying to fight" Mr. Watson. (Reece Dep. 80:9–12, ECF No. 25-2.)  Garcia was with Driver. (Reece Dep. 82:2–5, ECF No. 25-2.)  Plaintiff was approximately ten to eleven feet ahead of Watson at the time. (Reece Dep. 86:1–2, ECF No. 25-2.)

Plaintiff then saw Driver "take a punch at Charles Watson," which prompted Plaintiff to drop his bags and run and grab Driver in an effort to keep him off of Watson. (Reece Dep. 83:4–5, ECF No. 25-2.)  Plaintiff explained that he did not grab Driver aggressively; he was "[t]rying to just break it up." (Reece Dep. 87:2–9, ECF No. 25-2.)  At the same time, Marshall grabbed Watson. (Reece Dep. 87:10–15, ECF No. 25-2.)  Mr. Marshall, Watson, and Plaintiff then left the premises. (Reece Dep. 88:1–2, ECF No. 25-2.)

### C.    The Investigation

Defendant conducted an investigation into the altercation and took the statements of eight individuals, seven of whom had witnessed the afternoon fight. (Exs. 3–10, ECF No. 25.)  Only two of those statements implicated Plaintiff as being involved in the fight, Driver and his companion, Garcia.

Driver, the person who Plaintiff alleges incited the altercation by confronting and threatening Watson, implicated Plaintiff by stating: "Ivy Reese was in front of me and Undrea Marshall, Charles Watson was behind me.  Chris Garcia was on the side of me and we were talking once we cleared the gate they jumped me hitting and kicking me in the face for about 5 minutes and then they just stop and continued to Chris Garcia's truck to go home." (Ex. 5, ECF No. 25-3.)

Garcia, who had been Omar Driver's companion during the earlier morning incident, was again accompanying him during the afternoon incident.  Garcia indicated that:

///

> On 10-29-08 around 3:00pm Omar and I were coming in from route we both went to the locker room . . . We walk across the yard while Ivy Reese [sic] stay [sic] about 20 feet in front of us. Andre [sic] Marshal [sic] is close next to us. Charles Watson was far behind us about 40 feet.  As soon as we get through the gate to "C lot" Charles Watson grabs [sic] Omar from behind while Andre [sic] Marshal [sic] & Ivey [sic] Reese [sic] were punching Omar.  I was trying to break it up. They wrestled him to the ground punching and kicking him.

(Ex. 3, ECF No. 25-2.)

None of the other seven eyewitnesses indicated that Plaintiff was a combatant in the fight.  For example, Lance Singleton merely described the afternoon incident by writing, "And that was second part of this sit [sic] start Omar [Driver] try to hit Chuck [Watson] again and that went [sic] the fight start. The other Coworker I see then trying breke [sic] up the fight!" (Ex. 4, ECF No. 25-2.)

Watson described the afternoon fight by indicating, "[Driver] trying to restart the fight from earlier. People that was [sic] already walking to C lot or by there [sic] cars, stop the alteration [sic]." (Ex. 9, ECF No. 25-3.)

Joe Brown refused to make a formal statement, but Paniccia relayed to Ms. Hunsberger what Brown had said to him, writing, "He claims he does not know who started the fight other than Charles Watson and Omar Driver were fighting.  He went on to say that the fight broke-out [sic] while he was walking to his car, he heard a noise turned around and saw individuals breaking-up [sic] the fight." (Ex. 10, ECF No. 25-3.)

Plaintiff himself explained in his statement, "I'm walking to C-lot, and Omar Driver comes up to Charles Watson and said whats [sic] up Bitch and threw a couple of punches, I grabbed Omar to stop the altercation." (Ex. 6, ECF No. 25-3.)  Esteban Gomez stated: "I saw a fight in the parking lot by my frind [sic] truck like five guys but only two guys were fighting I saw only like two or 3 punches to echother [sic] that only what I saw." (Ex. 7, ECF No. 25-3.)

Defendant held a fact-finding meeting concerning the afternoon altercation on November 7, 2011. (Ex. 17, ECF No. 25-4.)  Both Paniccia and Ms. Hunsberger were present at the meeting (*id.*), despite the fact that she likely had knowledge of Plaintiff's recently-filed Charge of Discrimination against Defendants alleging disparate treatment by Paniccia, (Hunsberger Decl. ¶ 22, ECF No. 23-1).  Ultimately, the unanimous decision to terminate Plaintiff's employment was made by Ms. Hunsberger; Hank Vasquez--Defendant's Senior Area Human Resources Manager; Bob Coyle--Defendant's Area President; and Joe Knoblock--Defendant's former General Manager at Cheyenne Transfer Station. (Hunsberger Decl. ¶ 20, ECF No. 23-1.)

Despite Plaintiff's arguments to the contrary, (*see* Resp. 11 ¶ 54, ECF No. 25), it does not appear as though Paniccia was actually present when the decision was made to terminate Plaintiff.[3]  Although Ms. Hunsberger admits that she had knowledge of Plaintiff's Charge of Discrimination at the time the decision was made to fire him, she attests that she did not share that information with any of the other three individuals who agreed Plaintiff's employment should be terminated. (Hunsberger Decl. ¶ 22, ECF No. 23-1.)

Ultimately, "Republic terminated the employment of all four employees involved in the fight (Reece, Marshall, Watson, and Driver) for 'violence in the workplace.'" (Hunsberger Decl. ¶ 19, ECF No. 23-1.)  Mr. Garcia was not terminated, even though he admitted in his statement to participating in both altercations by breaking up the morning

---

[3] Plaintiff's contention that Paniccia was involved in the decision to terminate Plaintiff appears to be based on an incorrect reading of Defendant's Response to Interrogatory Number 12 posed by the Plaintiff.  In that response, Defendant listed Paniccia under the heading "The individuals that participated in the investigation, termination, and grievance procedures of Plaintiff include the following." (Ex. 18 p. 7, ECF No. 25-5.)  Although this phrase could be read to imply that Paniccia participated in all of the events listed in the phrase--the investigation, the termination, and the grievance procedures, it can also be read as indicating that Paniccia participated in some manner in the cumulative proceedings and did not necessarily participate in the each of the three events explicitly listed.  Were this the final bit of evidence on the matter, then a juror might be able to rationally draw the inference that Paniccia was involved in the decision to terminate Plaintiff.  However, in her sworn Declaration, Ms. Hunsberger cures any ambiguity in Defendant's earlier response by explicitly listing the people who actually decided to terminate Plaintiff. (Hunsberger Decl. ¶ 20, ECF No. 23-1.)  Paniccia is not on that list, nor does Plaintiff provide any evidence--other than the arguably ambiguous response to Interrogatory 12--to support the inference that Paniccia was involved in the decision to terminate Plaintiff.  Accordingly, it does not appear that Paniccia was actually present.

altercation and trying to break up the afternoon fight, (Ex. 3, ECF No. 25-2).

### D.   Procedural History

This action was initially commenced by Plaintiff on December 30, 2009 in state court but was removed to this Court--on federal question grounds--on January 26, 2010. Defendant filed a Motion for Summary Judgment (ECF No. 22), to which Plaintiff filed a Response (ECF No. 25).  Defendant filed a Reply (ECF No. 26) and, on the same day, filed a Motion to Strike (ECF No. 27) the vast majority of Plaintiff's statement of material facts.

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).  Part of the rationale behind this is that "[o]bviously, Rule 56 does not require the nonmoving party to depose h[is] own witnesses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  With these guiding concepts in mind, the Court will address those of Defendant's evidentiary objections that are material to its ruling during the course of this opinion.  Objections that are not material will not be addressed. *See Norse*, 629 F.3d at 973 (a district court must "rule on evidentiary objections that are material to its ruling").

## II.   SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication if "the movant demonstrates there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is

---

[4] Federal Rule of Civil Procedure 56 was recently amended, effective December 1, 2010. *See* Fed. R. Civ. P. 56 Advisory Committee Notes, 2010 Amendments.  The standard for granting summary judgment remains the same. *Id.* Amendments to the Federal Rules of Civil Procedure govern proceedings that are pending at the time the amendments become effective, as long as the Supreme Court does not specify otherwise and the application would not be infeasible or work an injustice. Fed. R. Civ. P. 86(a)(2).  Because the Supreme Court has not specified otherwise and the new amendments would not work an injustice, this Court will apply the language of Rule 56 as amended.

inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec.*

*Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party

cannot avoid summary judgment by relying solely on conclusory allegations that are

unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Instead, the opposition must go beyond the assertions and allegations of the pleadings and set

forth specific facts by producing competent evidence that shows a genuine issue for trial. *See*

*Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine

the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S.

at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely

colorable or is not significantly probative, summary judgment may be granted. *See id.* at

249–50.

### III.    DISCUSSION

#### A.   Retaliation

Plaintiff claims that Defendant unlawfully retaliated against him in violation of 42

U.S.C. § 1981 ("Section 1981") when it fired him less than a month after he had filed a

Charge of Discrimination with the Nevada Equal Rights Commission against Defendant and

one of its managers--Santino Paniccia. (Am. Compl. 3 ¶¶ 15–23, ECF No. 6.)  Although the

text of section 1981 does not explicitly indicate that a claim of retaliation may be brought

under it, the Supreme Court has recently held that section 1981 does, indeed, encompass

claims of retaliation. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 458 (2008).

Retaliation claims under Title VII and section 1981 share identical legal standards.

*See Manatt v. Bank of America, NA*, 339 F.3d 792, 801 (9th Cir. 2003).  To establish a *prima*

*facie* case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse

employment action; and (3) a causal link between the protected activity and the adverse

employment action. *Surrell v. California Water Service Co.,* 518 F.3d 1097, 1108 (9th Cir. 2008).  Once established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions.  At that point, the plaintiff must produce evidence to show that the reasons stated by the defendant were a pretext for retaliation. *Id.*

### 1.   *Prima Facie* Case

Defendant does not dispute that Plaintiff fulfills the first two elements necessary for a *prima facie* case of retaliation, (*see* Mot. 3:5–4:5, ECF No. 20).  Plaintiff filed a Charge of Discrimination on October 17, 2008 and his employment with Defendant was terminated less than one month later on November 12, 2008.

Defendant does, however, contend that the record is devoid of any evidence suggesting a causal link between Plaintiff filing the Charge of Discrimination and Defendant subsequently terminating him. (Mot. 3:6–7, ECF No. 90.)  Although apparently cognizant of the short period of time that elapsed between Plaintiff engaging in the protected activity and his termination, Defendant argues that "temporal proximity, by itself, is not sufficient to defeat summary judgment," (Mot. 3:17–18, ECF No. 90).  Defendant cites *Medrano-Alfaro v. Nevada System of Higher Education*, 3:07-cv-00360-RCJ-VPC, 2009 WL  3319804, *8 (D. Nev. Oct. 14, 2009) in support of this proposition.  This Court does not agree with the Defendant's interpretation of the holding in that case.

In *Medrano-Alfaro*, Judge Jones actually found that close temporal proximity *was* sufficient, at the summary judgment stage, to establish a causal link between the protected activity and the adverse employment action. *Id.*  Indeed, Judge Jones concluded that "the close temporal proximity between Plaintiff's complaints and the subsequent adverse employment actions are sufficient to establish causation for purposes of Plaintiff's prima facie case." *Id.* In that case, the time periods between the protected activities and adverse employment action were actually longer than in the instant case, as the plaintiff in *Medrano-*

*Alfaro* filed his initial affirmative action complaint on March 20, 2006; was placed on administrative leave on July 18, 2006; then filed a complaint alleging retaliation on July 20, 2006; and was subsequently directed to undergo a psychological evaluation on August 21, 2006. *Id.*

The Ninth Circuit is in accord with Judge Jones' ruling, having held that "[c]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory employment decision." *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 731 (9th Cir. 1986). If a plaintiff relies solely on the proximity in time inference to support the causation prong, however, that proximity in time must be "very close." *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (per curiam) (citing cases finding a three-month period and a four-month period too long). Here in this case, less than a month elapsed between the date on which Plaintiff engaged in protected activity by filing a Charge of Discrimination on October 17, 2008 and the date on which he was fired, November 12, 2008. Such a short period of time is sufficient to permit an inference of causation; therefore, Plaintiff has established a prima facie case of retaliation, and the Court must now turn to examine Defendant's non-retaliatory reasons and any evidence of pretext.

### 2.   Legitimate, Non-Retaliatory Reason

The burden now shifts to Defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Surrell*, 518 F.3d at 1108. Defendant claims that Plaintiff was fired after an internal investigation determined that he had been involved in a physical altercation with several co-workers on Defendant's property in violation of company policy. Specifically, Defendant notes that the statements provided by Garcia and Driver implicate Plaintiff as an active participant in the October 29, 2008 altercation (Hunsberger Decl. ¶ 15, ECF No. 23), and that such statements when viewed alongside

Defendant's Rules of Conduct, supported its decision to fire Plaintiff.  This explanation is sufficient to shift the burden back to Plaintiff to produce evidence to show that the stated reasons were a pretext for retaliation.

### 3.   Evidence of Pretext

Although Defendant does set forth a legitimate, non-retaliatory reason for the adverse employment action, Plaintiff also sets forth sufficient evidence to allow a reasonable juror to conclude that Defendant's justification for terminating Plaintiff was merely pretextual.  As such, a question of material fact exists as to whether Defendant did, in fact, have a retaliatory intent, and summary judgment cannot be granted.

First, the same temporal proximity between the date on which Plaintiff filed his Charge of Discrimination and the date on which Plaintiff was terminated--less than one month—which permitted an inference of a causal link, could also help a reasonable juror conclude that Plaintiff's filing of the Charge triggered his subsequent discharge. *See Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (reasoning that a forty-two or fifty-nine day period between the employee engaging in a protected activity and the employee's subsequent discharge could allow a reasonable jury, at the pretext stage, to infer that the protected activity triggered the subsequent discharge).  It makes no difference that this evidence was already used to establish the causation element of the *prima facie* case; "[t]o show pretext, a plaintiff may rely on evidence offered to establish the prima facie case," *Miller*, 885 F.2d at 505 n.8.

Second, a jury could properly infer a retaliatory motivation from the undisputed evidence that at least one of the management personnel who participated in the decision to terminate Plaintiff--specifically, Ms. Hunsberger--was aware that the Charge of Discrimination that he had filed. *See Miller*, 885 F.2d at 505.  Although this is mitigated to some extent by the fact that Plaintiff's disparate treatment charge was never explicitly

discussed at the meeting where it was decided to terminate Plaintiff, a jury could still find that a retaliatory motivation was lurking unspoken in the background, especially in light of the claim that coworker Wade Woods made a comment to Plaintiff indicating he had knowledge of the charge. (Reece Dep. 47:15–16, ECF No. 25-2.)  It would not be appropriate for the Court to make a factual determination at this stage in the proceedings. However, had Defendant provided affidavits from the other individuals who agreed to terminate Plaintiff indicating that Ms. Hunsberger remained silent during the meeting, or that they would still have decided to terminate Plaintiff regardless of any comments made by Ms. Hunsberger, and that they were not aware at the time of Plaintiff's recently filed charge or that it was never discussed or a factor they considered, then the Court's decision in this respect may have been different.  Information relating to why Plaintiff was terminated and Garcia was not despite their similar conduct (trying to break up the altercation) and despite Garcia's involvement in both the morning and afternoon incident when Plaintiff was only involved in the latter, could also have assisted the Court in its determination.

Finally, a juror--in conjunction with the other facts in this case--could infer retaliatory motive from the fact that Plaintiff was fired even though he was implicated as a combatant in the fight only by the statements of Garcia and Driver, whereas apparently neutral eyewitnesses stated that either only Driver and Watson were fighting, (Ex. 4, ECF No. 25-2), or, similarly, that only two men were fighting, (Ex. 7, ECF No. 25-3).  This inference is particularly plausible due to the suspect credibility of Garcia and Driver.  Driver was on less than friendly terms with Watson, so it is not a tremendous logical leap to infer that he might be less than truthful in describing the actions of Watson and his carpooling coworkers, such as Plaintiff.  Likewise, Garcia was in close proximity to Driver during both the morning and afternoon altercations; went to the locker room with Driver; was going to drive him home; and was talking to him just prior to the afternoon fight (Exs. 3 & 5, ECF No. 25-2)--thus

allowing a juror to infer a friendship between them and, therefore, a shared motivation to harm Watson and his associates including Plaintiff.

Contrarily, no such inferences of bias can be drawn with regard to the statements made by Singleton and Gomez.  Both of their statements would likely be afforded greater credibility by a reasonable juror than those of Garcia and Driver.  Based on this disparity in credibility between the statements that implicated Plaintiff and those that did not, as well as the fact that only two of the seven eyewitness accounts implicated Plaintiff as a combatant, a reasonable juror could find that the reasons proffered for Plaintiff's termination were pretextual.[5]

Viewing the evidence in the light most favorable to Plaintiff, it is entirely possible that Plaintiff was merely trying to break up the afternoon fight, and, thus, a reasonable juror could also infer pretext from the fact that Garcia--who in his statement admitted to breaking up the morning fight and attempting to break up the afternoon fight--was not fired, while Plaintiff was.

Taking the evidence in its totality, a reasonable jury could rationally find that Defendant's decision to fire Plaintiff was a mere pretext and Plaintiff's termination was actually in retaliation for him filing the Charge of Discrimination for disparate treatment.

---

[5]   In its Motion to Strike, Defendant objects to the Court considering the statements referred to in this paragraph explaining that the statements are hearsay and are not relevant to any material fact. (*See* Mot. to Strike ¶¶ 18-28, ECF No. 27.)  However, as explained earlier, "the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial," *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010), as "[o]bviously, Rule 56 does not require the nonmoving party to depose her own witnesses," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  At trial, Plaintiff could present the facts set forth in these statements through direct examination of witnesses or by other means if sufficient factors are demonstrated to justify having the evidence admitted as a Recorded Recollection (Federal Rule of Evidence 803(5)) or Residual (Rule 807) exceptions to the hearsay rule.

As to the relevance objection, such evidence is relevant to whether Defendant's justification for firing Plaintiff was pretextual.  As is explained later in the opinion, although courts are generally deferential to the business judgment of employers in making employment decisions, the mere fact that business judgment was exercised does not automatically insulate an employer from liability.  As one of the cases that Defendant cites in its own Motion for Summary Judgment (Mot. Summ. J. 9:4-7, ECF No. 22) explains, summary judgment can be inappropriate where facts "exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2nd Cir. 1988).  Therefore, these statements are relevant to whether Defendant's decision was pretextual and lacking in merit to such an extent, particularly in light of the other facts on the record.  Accordingly, the Court will consider the eyewitness statements for the purposes of summary judgment.

Because of this, and because "[a]n employee's claim of retaliatory discharge requires a determination of an employer's true motivation, an elusive factual question which is difficult to ascertain and generally unsuitable for summary disposition," *Miller*, 885 F.2d at 506, summary judgment will not be granted as to Plaintiff's claim for retaliation.

Defendant devotes substantial space to the notion that "courts consistently have held that they should not second guess an employer's exercise of its business judgment in making personnel decisions, as long as they are not discriminatory," (Mot. 8:14–17, ECF No. 22), and contends that Defendant's decision to fire Plaintiff was a simple exercise of business judgment that should be given significant deference by the Court.  Defendant is correct, in part: an employer's personnel decisions need not be overturned by the Court even if they are based on incorrect or incomplete information, as long as such decisions are made for *nondiscriminatory*--or, in this case, *non-retaliatory*--reasons. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

This case, however, is not one in which Plaintiff is simply alleging that Defendant incorrectly evaluated the reports of the altercation and, therefore, wrongly terminated him. This is a case in which the totality of the facts--the timing of the termination in relation to the previously filed disparate treatment charge, the presence of Ms. Hunsberger at the meeting to determine Plaintiff's fate, combined with what could be construed as a selective reading of the investigative reports--could leave a reasonable juror with the firm impression that Defendant's justification for terminating Plaintiff was a pretext designed to obscure its improper retaliatory motives.  The jurors are not going to be tasked with evaluating only whether Defendant's business judgment was sound; rather, the jurors are additionally going to be tasked with evaluating whether the Defendant's actions, combined with all of the other

evidence presented in the case, demonstrated that Defendant's rationale for firing Plaintiff was merely pretextual.  As such, summary judgment would be inappropriate as to this cause of action.

### B.   Negligent Hiring, Training, and Supervision

#### 1.   Negligent Hiring

The tort of negligent hiring imposes "a general duty on an employer to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position." *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996).  This duty is breached when the employer "hires an employee even though the employer knew, or should have known, of that employee's dangerous propensities." *Id.*  Plaintiff does not contest Defendant's Motion for Summary Judgment as to this cause of action, nor can he, as Plaintiff has produced no evidence indicating that Defendant failed to perform a reasonable background check on any of its employees or that Defendant hired any of its employees even though it knew or should have known that the particular employee had dangerous tendencies.  Accordingly, summary judgment will be granted as to Plaintiff's claim for negligent hiring.

#### 2.   Negligent Training and Supervision[6]

An employer also "has a duty to use reasonable care in the training, supervision, and retention of his or her employees to make sure that the employees are fit for their positions." *Hall*, 930 P.2d at 99.  The elements of a claim for negligent training and/or supervision are: (1) a general duty on the employer to use reasonable care in the training and/or supervision of employees to ensure that they are fit for their positions; (2) breach; (3) injury; and (4) causation. *Lambey v. Nevada*, No. 2:07-cv-01268-RLH-PAL, 2008 WL 2704191, *4 (D. Nev. July 3, 2008).

In order to prevail on a negligent training or supervision claim, the plaintiff must

---

[6] Defendant provides the elements of these causes of action as they are set forth in *Helle v. Core Home Health Services of Nevada*, No. 48427, 2008 WL 6101984, * 8 (Nev. Nov. 20, 2008).  However, *Helle* is an unpublished Nevada Supreme Court decision and, as such, may not be cited as legal authority according to Nevada Supreme Court Rule 123.

allege facts specifically indicating how the employer violated its duty. *Colquhoun v. BHC Montevista Hospital, Inc.*, No. 2:10-cv-00144-RLH-PAL, 2010 WL 2346607, *3 (D. Nev. June 9, 2010). Nevada law does not permit the inference that an employer was negligent in training or supervising simply because the Defendant's employees acted in a discriminatory manner; "the fact that an employee acts wrongfully does not in and of itself give rise to a claim for negligent hiring, training, or supervision." *Id.* In this case, Plaintiff claims Paniccia and Hunsberger were not properly trained or supervised by the Defendant. However, Plaintiff has provided an explanation for his belief which is only based upon his purely speculative assumptions. Plaintiff has failed to produce any additional evidence, whether documentation, testimonial or otherwise, that would permit a jury to conclude that Defendant breached its duty to use reasonable care in the training or supervision of its employees.

a.    Negligent Training

The record is devoid of evidence indicating insufficient training or a complete lack of training on the part of Defendant, much less some sort of causal relationship between the insufficient training and the injuries Plaintiff alleges. Rather, Plaintiff points only to what he alleges to be inappropriate behavior on the part of Paniccia and Hunsberger and asks the Court to draw the impermissible inference that those alleged wrongdoings were caused by a lack of or insufficient training. As a matter of law, the Court cannot make such a leap, and Defendant's Motion for Summary Judgment must be granted as to negligent training. Although Plaintiff alleges that "it is clear that Defendant was not trained to keep such a complaint confidential" and "[n]or was Pannicea [sic] trained that it is completely improper to harass a witness names in a NERC complaint . . . ," (Resp. 22:6–8, ECF No. 25),[7] Plaintiff fails to indicate where in the record there is evidence that demonstrates Paniccia did harass

---

[7] Nor has Plaintiff produced any potentially admissible evidence that indicates that Mr. Paniccia actually knew about the NERC Charge of Discrimination or threatened Wade Woods with regard to that Charge. All that Plaintiff has offered is Plaintiff's purely speculative statement that:

Wade Woods and that Defendant failed to provide Paniccia reasonably adequate training as to these issues.  Plaintiff needed to offer more than impermissible inferences in order for this cause of action to survive Defendant's Motion.

### b.   Negligent Supervision

Similarly, Plaintiff contends that Defendant negligently supervised its employees because (1) Paniccia retained his job after using a racially-charged epithet to describe his co-workers; (2) Ms. Hunsberger knew that Paniccia was lying in an attempt to discipline Plaintiff, yet failed to take any action; (3) Paniccia threatened a witness named in the NERC Charge; and (4) Paniccia eventually participated in making the decision to terminate Plaintiff. (Resp. 22:2–24, ECF No. 25.)

Both Plaintiff's first and second arguments are time-barred by Nevada's two-year statute of limitations for negligence claims. *See* Nev. Rev. Stat. § 11.190(4)(e).  Plaintiff's Complaint was not filed until December 30, 2009, which is more than two years after Paniccia allegedly made a racially derogatory remark in 2004 or 2005 and more than two years after Plaintiff complained to Ms. Hunsberger on December 21, 2007 about Paniccia allegedly lying in an attempt to discipline Plaintiff.

With regard to Plaintiff's third claim, the Court has already explained that there is no potentially admissible evidence in the record to support Plaintiff's claim that Paniccia

---

**Plaintiff. So then I goes to the Nevada Equal Rights and then they—I guess they sent the paperwork to the company and Sunny went and said something to [Woods] which he wasn't supposed to do because it's confidential.  He went and scared the mess out of Wade Woods and he changed his whole story.  When the Equal Rights Commission called him, he recanted his while story.  That's why that one got dismissed.**
Q. Did you talk to Mr. Woods?
**A. Yes.**
Q. Is that what Mr. Woods told you?
**A. He was just – he came up to me and why did you say something. And I was – I said you told me pretty much you was going to back me and that's why I put you in the complaint.  He just changed his whole story.**

(Reece Dep. 47:4-18, ECF No. 25-2.)  Thus, it is only based on Plaintiff's "guess" and the fact that Mr. Woods asked him "Why did you say something?" that Plaintiff is claiming that Paniccia learned about the Charge and then harassed Mr. Woods concerning it.  It just as likely that Ms. Hunsberger asked Woods about the incident as part of her investigation in preparation for submitting a response to Plaintiff's charge.

"scared the mess out of Wade Woods and he changed his story." Plaintiff is merely speculating as to Paniccia's actions based on his own "guess" and the mere fact that Mr. Woods asked him, "Why did you say something?" Plaintiff does not purport to have personal knowledge that Paniccia actually scared Wade Woods in an attempt to make him stay quiet, nor did Wade Woods ever tell Plaintiff that he did. It is just as likely that Ms. Hunsberger or some other employee asked Woods about the incident as part of defendant's own investigation of the charge (possibly in preparation for submitting a response to its management or to NERC).

Even if Plaintiff's speculation were somehow admissible, however, Plaintiff would still fail in this argument, as he has produced absolutely no evidence that a lack of or unreasonable supervision on the part of Defendant was the "but for" cause of Paniccia making the alleged threats toward Wade Woods. Without such a showing and without any actual evidence on the record supporting Plaintiff's claim, perhaps demonstrating to what extent Paniccia was or was not supervised, Plaintiff cannot prevail on this theory of negligent supervision.

As has already been noted, Plaintiff's fourth contention is also unsupported by the record: Plaintiff's argument that Paniccia participated in making the decision to terminate Plaintiff appears to be based on a misreading of Defendant's response to Interrogatory Number 12 posed by the Plaintiff. However, even if Plaintiff had presented competent evidence showing that Paniccia may have participated in this decision, Plaintiff still could not prevail on this theory, as he has produced no evidence of the manner in which Defendant did or did not supervise Paniccia, nor has he produced evidence of how that supervision or lack thereof actually caused the alleged harm Plaintiff suffered. Plaintiff has merely presented an alleged harm and asked the Court to make the impermissible inference that the harm was caused by some unproven lack of supervision. Accordingly, this theory must fail.

Because all of Plaintiff's other three theories also fail, summary judgment will be entered as to Plaintiff's claim for negligent supervision.

Although the Court will refrain from making such a ruling at this time because the Nevada Supreme Court has not yet settled the issue, Plaintiff's negligent supervision and negligent training claims may also fail simply because Plaintiff failed to show physical harm or a threat of physical harm resulting from Defendant's actions or inaction. *See Barnes v. National Council of Juvenile & Family Court Judges*, No. 3:10-cv-00528-ECR-RAM, 2010 WL 5102258, *2 (D. Nev. Dec. 03, 2010) (predicting that, given the opportunity to do so, "the Nevada Supreme Court would explicitly rule that physical harm is necessary for a negligent hiring, retention and supervision claim in Nevada").  Because the judges of this District are in disagreement as to whether physical harm is actually required, this Court certified this question to the Nevada Supreme Court on August 9, 2010.  Specifically, the Court posed the question:

> Does a claim for Negligent Training and Supervision in Nevada require that the plaintiff suffer physical harm as a result of the employer's negligence in training or supervising the employee that terminated the plaintiff?

*Robertson v. Wynn Las Vegas, LLC*, No. 2:10-cv-00303-GMN-LRL, 2010 WL 3168239, *5 (D. Nev. Aug. 9, 2010).  The Nevada Supreme Court case number of that proceeding is 56596 and is still in the briefing stage.

### C.   Injunctive and Declaratory Relief

Plaintiff lists injunctive and declaratory relief as his "Third Cause of Action." (Am. Compl. 4 ¶¶ 31-34.)  These are not causes of action, but, rather, forms of relief.  Because Plaintiff's claim for retaliation survives, these, too, will survive.

### <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF

No. 22) is **DENIED in part** and **GRANTED in part**.  Defendant's Motion for Summary

Judgment is **DENIED** as to Plaintiff's claim for retaliation and is **GRANTED** as to

Plaintiff's claims for negligent hiring, training, and supervision.

     **IT IS FURTHER ORDERED** that Defendant's Motion to Strike (ECF No. 27) is

**DENIED**, except to the extent that it is consistent with the Court's evidentiary rulings in this

Order.

     DATED this 10th day of March, 2011.

 

 

_____

Gloria M. Navarro
United States District Judge